IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CASE NO:** |
| | : | **7:24-cr-26–WLS-ALS-1** |
| **CLEMSON MAURICE GRAHAM,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## ORDER

Before the Court is Defendant's Consolidated Motion to Suppress Evidence and Request for Evidentiary Hearing (Doc. 55) ("Motion to Suppress"). Therein, Defendant Clemson Maurice Graham ("Clemson Graham" or "Defendant") requests the Court suppress any physical evidence, any video or audio recordings, and any identification testimony which the government seeks to introduce at the trial of this case. Defendant contends the evidence should be suppressed because three warrants issued and executed in this case violated Defendant's constitutional rights. Upon full review and consideration of the Record, including the briefs of the parties, testimony adduced at the Suppression Hearing, arguments of counsel, and for the reasons set forth below, the Motion to Suppress is **DENIED**.

## I.  PROCEDURAL BACKGROUND

On July 9, 2024, a federal grand jury issued a five-count Indictment (Doc. 1) ("Indictment") against Clemson Graham and Co-Defendant Jesse James Graham ("Jesse Graham" or "Co-Defendant").[1]

Defendant Clemson Graham is charged in Counts One through Four with Possession of a Firearm by a Convicted Felon; Possession with Intent to Distribute Methamphetamine; Possession with Intent to Distribute Cocaine; and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. The Government further alleges that prior to the instant offense,

---

[1] No motion to sever has been filed in this case.

Clemson Graham had three serious drug offenses and violent felony convictions on different occasions as listed in the Indictment. Jesse Graham is not a party to the Motion to Suppress.[2]

On February 28, 2025, Clemson Graham filed the instant Motion to Suppress. The Government filed a timely Response (Doc. 58), and the Court held an evidentiary hearing on June 25, 2025 ("Suppression Hearing").[3] The Government presented one witness, Trooper Steven Kornegay ("Tpr. Kornegay") with the Georgia State Patrol, and Defendant introduced a clip from Tpr. Kornegay's dashcam video. The Court permitted the parties to file post-hearing briefs, which have been filed, and the Motion to Suppress is ripe for decision. (*See* Docs. 66, 68). The trial of this matter has been continued to the Court's February 2026 Valdosta Trial Term (Doc. 75), pending resolution of the Motion to Suppress.

## II.  FACTUAL BACKGROUND

The Motion to Suppress relates to the following three searches:

1.     The installation of a Global–Positioning–System ("GPS") tracker on a white 2007 Chevrolet Tahoe ("Tahoe"), Georgia Tag RVW7842, which was authorized by an Order Authorizing Installation, Use, and Monitoring of Electronic Tracking Device (Doc. 55-1 at 8–9) ("GPS Warrant") dated August 10, 2021;

2.     A warrantless search of the Tahoe conducted on September 7, 2021, by law enforcement officers after Clemson Graham was stopped and detained by Tpr. Kornegay while driving the Tahoe ("Traffic Stop"); and

3.     The search of the residence located at 209 Ruth Lane, Thomasville, Georgia ("209 Ruth Lane"), pursuant to a warrant (Doc. 55-2 at 7) ("Ruth Lane Warrant") issued and executed on September 7, 2021.

The following facts relevant to each search are taken from the affidavits submitted in support of the GPS Warrant, the Ruth lane Warrant, and the testimony of Tpr. Kornegay with respect to the Traffic Stop.

---

[2] Jesse Graham is charged in Counts Two and Five with Possession with Intent to Distribute Methamphetamine and Possession of a Firearm in Furtherance of a Drug Trafficking Crime.

[3] The hearing was initially scheduled for May 27, 2025, but was continued at the Government's request because Trooper Steven Kornegay, a critical witness, did not receive the Government's subpoena. Defendant's counsel agreed Tpr. Kornegay was a critical witness.

### A. GPS Affidavit and Warrant

On August 10, 2021, Agent Jeffrey Cole Stanaland ("Agt. Stanaland"), of the Thomas County Sheriff's Office ("TCSO") submitted an affidavit (Doc. 55-1 at 1–7) ("GPS Affidavit") to the Thomas County Southern Judicial Circuit to obtain authorization to install a GPS tracker on the Tahoe. At that time, Agt. Stanaland was a deputy sheriff working as a narcotics agent with the Thomas County/Thomasville Narcotics and Vice Division ("Thomas County N&V"). (GPS Aff. 1). Specifically, the GPS Affidavit indicates Agt. Stanaland's believed, based on the information in such Affidavit, that he had probable cause to believe that Clemson Graham and others conspiring with him were committing the described drug trafficking crimes in violation of the Official Code of Georgia, and that they were using the Tahoe to commit and facilitate such crimes. (*Id.*)

Agt. Stanaland stated that in February 2021, he received information from a trustworthy confidential source ("CS-1") that Clemson Graham was selling MDMA and Cocaine from 209 Ruth Lane. Based on information obtained from CS–1, Agt. Stanaland believed Clemson Graham and others were importing, manufacturing, selling, possessing, and possessing with intent to distribute Cocaine and MDMA, and that they were using the Tahoe to commit and facilitate such crimes.[4] (*Id.*). CS-1 has seen MDMA in the past and was familiar with what MDMA looks like. (*Id.* at 3). The Tahoe had been observed parked at 217 Ruth Lane[5] and at 209 Ruth Lane, and Clemson Graham regularly used both addresses as his residence. (*Id.* at 2). CS-1 told Agt. Stanaland that Clemson Graham keeps or hides Cocaine, MDMA, and currency at 209 Ruth Lane. (*Id.* at 2). CS-1 further stated that Clemson Graham had a possible source of drug supplies at an unknown location in Georgia. (*Id.*) To corroborate CS-1's information, Agt. Stanaland conducted the following controlled buys with CS-1:

February 8, 2021: Agt. Stanaland conducted a controlled purchase of MDMA from Clemson Graham through CS-1. The purchase was set up via a phone call between CS-1 and Clemson Graham which was actively monitored by agents. Clemson Graham advised that the purchase was to take place at 209 Ruth Lane, CS-1 was provided with funds from the Thomas

---

[4] The Tahoe was not registered to Clemson Graham, but to Ernest Graham of 217 Ruth Lane, Thomasville, GA. (GPS Aff. 1).

[5] CS-1 identified 217 Ruth Lane as the residence of Clemson Graham's parents, and identified Ernest Graham as Clemson Graham's father. (*Id.* at 2).

County N&V to purchase .4 grams of MDMA; Agt. Stanaland and other agents surveilled the location before and during the controlled buy; Clemson Graham met CS-1 at the location; exchange of money and drugs was completed; CS-1 met Agt. Stanaland at a secondary location nearby, and turned over the purchased drugs which field-tested positive for MDMA; the MDMA was placed into evidence retention by Agt. Stanaland. (*Id.* at 3).

February 18, 2021: For the second controlled buy with CS-1, Agt. Stanaland met with CS-1 who was again provided with N&V funds to purchase MDMA from Clemson Graham; Clemson Graham advised CS-1 to meet at 209 Ruth Lane;[6] Agt. Stanaland and other agents conducted "mobile as well as static surveillance" on CS-1's vehicle travelling to the Ruth Lane area; shortly thereafter CS-1 contacted Agt. Stanaland and they met at a secondary location where CS-1 turned over the drugs which field-tested positive for MDMA; and the MDMA was placed into evidence retention by Agt. Stanaland. (*Id.*)

June 11, June 14, June 17, and June 23, 2021: Agt. Stanaland met with CS-1 and four additional controlled buys were conducted on these dates in the same manner and with the same results as the February 18, 2021 controlled buy. (*Id.* at 3–4).

In further corroboration and support for the GPS Warrant, Agt. Stanaland conducted electronic surveillance at the 209 Ruth Lane residence on July 10, July 13, and July 24, 2021, during which he observed nine instances of individuals/customers coming to 209 Ruth Lane, staying a few minutes, and conducting what appeared to be drug transactions. The details of these transactions are set out in the GPS Affidavit. (*Id.* at 4–5). In summary, some of the customers went to the rear of the residence, returning shortly afterward and were observed holding suspected narcotics or putting suspected narcotics in their pockets. Other transactions were conducted in the driveway of 209 Ruth Lane by customers coming up to Clemson Graham as he drove the Tahoe into the driveway, or by Clemson Graham exiting 209 Ruth Lane and meeting customers while they stayed in their vehicles. All of the transactions were conducted by Clemson Graham except one which was completed by a female who exited 209 Ruth Lane and met the customer at the customer's vehicle. Agt. Stanaland's information

---

[6] The GPS Warrant does not state whether Agt. Stanaland or other agents monitored the communication between CS-1 and Clemson Graham setting up the February 18, 2021, and subsequent controlled buys.

regarding these transactions includes the date the transaction occurred, the time the customer arrived, and the time the customer left 209 Ruth Lane. (*Id.* at 4-5).

According to CS-1, Clemson Graham sometimes stays at an unknown location in Boston, Georgia, with an unknown girlfriend. Agt. Stanaland believed the information provided by CS-1 is factual because Agt. Stanaland observed that Clemson Graham stays at 209 Ruth Lane four to five days per week and is gone in the Tahoe overnight two to three days per week. Based on his knowledge, training, and experience Agt. Stanaland believed that Clemson Graham was possibly holding illegal narcotics at another undisclosed location. (*Id.* at 5).

Agt. Stanaland averred that there was probable cause to believe that installation and monitoring of a mobile electronic tracking device in or on the Tahoe would result in acquisition of evidence of criminal offenses which were being and/or about to be committed by Clemson Graham and others conspiring with him. Physical surveillance of the Tahoe was not practicable due to the difficulties and/or limitations inherent in physical surveillance, and the possible risk to individual officers and/or risk of compromising the investigation. Agt. Stanaland requested authorization to use the tracking device for forty-five days on the Tahoe. (*Id.* at 5–6). The GPS Affidavit was sworn to by Agt. Stanaland before Judge James L. Prine. (*Id.* at 7). Although there is a notation on the last page of the GPS Affidavit, initialed by Judge Prine, indicating that oral testimony was also provided in support of the GPS Affidavit, the Government did not introduce evidence as to such additional oral testimony. The GPS Warrant was issued August 10, 2021. (*Id.*) Agt. Stanaland filed a return on that warrant stating that the GPS tracker was installed on August 14, 2021, and removed on September 7, 2021. (Doc. 55 at 3; Doc. 58 at 2).

**B. Traffic Stop and Tahoe Search**

At the time of the Suppression Hearing, Tpr. Kornegay had been with the Georgia State Patrol for almost eleven years and had made approximately 25,000 traffic stops. He had also assisted various agencies when requested to conduct traffic stops on suspicion of narcotics, and worked about "two and a half years with a criminal interdiction unit in Atlanta and on 75, and then Thomasville Post." (Suppression Hr'g Tr. 13:8–10, ECF No. 65 [hereinafter "Hr'g Tr. ___"]; *see also generally* Hr'g Tr. 12–14). When asked to make a stop by

another agency, Tpr. Kornegay testified that "I'd make my probable cause and conduct the traffic stop according to the policy that we have set up with the patrol." (*Id.* 14:12–14).

On September 7, 2021, Agt. Stanaland contacted Tpr. Kornegay and requested that he conduct a traffic stop of a white Tahoe Suburban that was suspected of transporting narcotics. Tpr. Kornegay was provided with the Tahoe's license plate number. (*Id.* 14:15–15:2). Tpr. Kornegay observed the Tahoe on Georgia 300 coming into Georgia out of Florida and visually estimated that it was speeding. He then checked the vehicle's speed with his radar, which verified the Tahoe was going 70 mph in a 65-mph zone. (*Id.* 15:3–15; 18:8–14). According to Tpr. Kornegay, exceeding the speed limit gave him probable cause and he stopped the Tahoe based on that violation of law. (*Id.* 15:16–22; 22:18–21). He instructed Clemson Graham to exit the Tahoe and walk back toward him, at which time Tpr. Kornegay saw Clemson Graham chewing on something which he then observed was green marijuana. (*Id.* 15:23–16:4; 22:22–23:). He also smelled the marijuana and detained Clemson Graham. (*Id.* 15:25–16:6).

Tpr. Kornegay did not participate in the search which was conducted by other law enforcement officers who had arrived at the scene after Clemson Graham was placed in handcuffs. (*Id.* 16:10–14). The officers recovered Cocaine and U.S. currency in a zip-up bag located under the passenger seat. (*Id.*) A woman and her two young children were passengers in the Tahoe. (Doc. 55 at 4).

Tpr. Kornegay stopped the Tahoe for speeding, and the warrantless search was conducted based on the odor and observation of green marijuana. (*Id.* 16:15–19).

### C. Ruth Lane Affidavit and Warrant

On September 7, 2021, Agt. Stanaland submitted an affidavit (Doc. 55-2 at 1–6) ("Ruth Lane Affidavit") to Judge Prine seeking a warrant authorizing the search of 209 Ruth Lane, the person of Clemson Graham, and the Tahoe. Agt. Stanaland had been contacted by a previously reliable confidential source ("CS-2")[7] within thirty days of submitting the Ruth Lane Affidavit. CS-2 was believed to be reliable because within the past year it had given information to the N&V and Agt. Stanaland on thirty-two separate occasions that resulted in

---

[7] Agt. Stanaland does not state that this confidential source is the same as CS-1, and the Court does not make such assumption.

the recovery of a quantity of illegal drugs. CS-2's motive for assisting was a monetary award. (Ruth Lane Aff. 2).

CS-2 knew Clemson Graham and knew he lived at 209 Ruth Lane, which CS-2 described as a beige, single-family dwelling with green trim, being the second residence on the right on Ruth Lane facing Cross Street. (*Id.*) CS-2 knew that Clemson Graham sold Cocaine and "Molly" aka MDMA from his residence. He knew the substances were Molly and Cocaine because he had seen those substances in the past and knew what they looked like. CS-2 also stated that Clemson Graham is known to drive a white Chevrolet Tahoe with GA Tag No. RVW7842, to meet people in town and conduct narcotics transactions. (*Id.*) To corroborate CS-2's information, Agt. Stanaland conducted the following four controlled buys with CS-2:

Within 30 days prior to September 7, 2021 (August 8, 2021): CS-2 was instructed to go to 209 Ruth Lane and purchase Molly from Clemson Graham; CS-2 was searched prior to the controlled buy and no drugs were found; CS-2 was provided with N&V funds; Agt. Stanaland observed CS-2 at 209 Ruth Lane; CS-2 returned a short time later and turned over suspected Molly to Agt. Stanaland which CS-2 stated it purchased from Clemson Graham. The drugs field-tested positive for MDMA. (*Id.*)

August 18, 2021, August 28, 2021, September 2, 2021:[8] Agt. Stanaland met with CS-2 on each of these dates and three additional controlled buys of Molly were conducted on those dates in the same manner and with the same results as the August 8, 2021 controlled buy. (Ruth Lane Aff. 3).

In further corroboration, Agt. Stanaland confirmed the location of 209 Ruth Lane through the Thomas County Tax Assessor records. (*Id.*) He also confirmed that the Tahoe was owned by Ernst Graham of 217 Ruth Lane. Through the Thomas County Sheriff's Office reporting system, Agt. Stanaland stated that Eugene Graham[9] was listed as Clemson Graham's father per booking information of Clemson Graham's last arrest. (*Id.*) Within five days prior to September 7, 2021 (September 2, 2021), Agt. Stanaland conducted a static surveillance of

---

[8] The Ruth Lane Affidavit states these transactions occurred within 20 days prior to September 7, 2021 (August 18, 2021); within 10 days prior to September 7, 2021 (August 28, 2021); and within 5 days prior to September 7, 2021 (September 2, 2021). (Ruth Lane Aff. 3).

[9] It is unclear whether this is a typographical error, as "Ernest" Graham has previously been identified as Clemson Graham's father and the owner of 217 Ruth Lane. (*See* GPS Aff. 1–2).

209 Ruth Lane and the description of the residence matched that given by CS-2—although Agt. Stanaland was unable to observe any numerical address attached to the house. He did, however, observe the Tahoe in the yard of 209 Ruth Lane and observed Clemson Graham at the residence on multiple occasions during the five-day surveillance. (*Id.*)

The Ruth Lane Warrant was issued September 7, 2021 at 4:03 p.m. and was executed at 5:11 p.m. that same day. (Doc. 55-2 at 7–8). The Return of the executed warrant reflects that a black shotgun, black revolver, a silver revolver, and drug paraphernalia were recovered from 209 Ruth Lane. (*Id.* at 8). The Return further indicates that a copy of the Ruth Lane Warrant was left with "Jesse Graham." (*Id.*)

In his Motion to Suppress, Clemson Graham notes that Co-Defendant Jesse Graham was present at 209 Ruth Lane when the Ruth Lane Warrant was executed. (Doc. 55 at 4). Clemson Graham goes on to allege that Jesse Graham advised officers that someone had left a handgun in the house which Jesse Graham had stuck in the sofa and that officers found a .38 revolver under the sofa cushion next to a wallet containing Jesse Graham's identification documents. (*Id.* at 4–5). Clemson Graham further alleges that in a bedroom that Jesse Graham identified as his, the officers found a RG 14 pistol in plain sight, a glass pipe and plastic bags—which Clemson Graham characterizes as "user-quantity size"—and with drug residue which field-tested positive as methamphetamine. (*Id.* at 5). In the dining room, the officers found a 12-gauge shotgun in plain sight hanging on the wall, as well as drug paraphernalia in the dining room and kitchen. (*Id.*) Clemson Graham did not provide evidence of or the source of the information relating to the location of the firearms or drug paraphernalia. Nor did he provide evidence of or the source of statements allegedly made by Jesse Graham to officers during the search.

## III.  LAW

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. De la*

*Fuente*, 548 F.2d 528, 533 (5th Cir. 1977);[10] *see also United States v. Mobley*, 808 F. App'x 899, 901 (11th Cir. 2020) ("We have made clear that '[t]he individual challenging the search bears the burdens of proof and persuasion.'" (quoting *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998))); *United States v. Jackson*, 618 F. App'x 472, 474 (11th Cir. 2015) ("The proponent of a motion to suppress has the burden to allege, and if the allegations are disputed, to prove, that his own Fourth Amendment rights were violated by the challenged search or seizure."); *United States v. Jackson*, 723 F. Supp. 3d 1347, 1351 (M.D. Ga. 2024) ("Generally, the party moving to suppress bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed." (citing *De la Fuente*, 548 F.2d at 533-34)). The burden of proof at a suppression hearing is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

However, the ultimate burden of persuasion may shift to the government if defendant, as movant, seeks to suppress evidence obtained via a warrantless search or challenges the legitimacy of a judicially-issued warrant. *De la Fuente*, 548 F.2d at 533–34. For search warrants to be valid, they must have (1) been supported by probable cause based on oath or affirmation, (2) been issued by a neutral and detached magistrate, and (3) particularly describe the place to be searched and the things to be seized. *Dalia v. United States*, 441 U.S. 238, 255 (1979). The burden of establishing that a search warrant is defective is upon the defendant. *United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid.").

With respect to a warrantless search, such as the search of the Tahoe, "[o]nce the movant establishes a basis for the motion, . . . the burden then shifts to the Government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified." *Jackson*, 723 F. Supp. 3d at 1351 (citing *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983)).

> Upon a motion to suppress evidence gathered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement,

---

[10] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment.

*Freire*, 710 F.2d at 1519 (citation omitted).

## IV. THE MOTION TO SUPPRESS

As noted above, the installation of the GPS system[11] and the search of 209 Ruth Lane were both conducted pursuant to warrants. The search of the Tahoe after it was stopped was warrantless. Clemson Graham contends that the GPS Warrant was invalid because it lacked probable cause. Specifically, he challenges the sufficiency of the GPS Affidavit asserting that controlled buys were not properly conducted and that the GPS Affidavit lacked probable cause to believe that Clemson Graham had an unidentified location where he conducted illegal drug activities. Defendant attacks the searches conducted during the Traffic Stop and pursuant to the Ruth Lane Warrant asserting they were tainted by the allegedly invalid GPS Warrant. Defendant contends that Tpr. Kornegay lacked probable cause to make the Traffic Stop. Therefore, Defendant seeks to suppress any physical evidence, any video or audio recordings and any identification testimony which the Government proposes to introduce at trial obtained from any of these searches. Notably, Defendant does not challenge the Ruth Lane Warrant on the basis that Ruth Lane Affidavit was itself insufficient.

Below, the Court first addresses Defendant's arguments as to the validity of the GPS Warrant, followed by Traffic Stop/Tahoe Search, and finally the Ruth Lane Warrant.

### A. GPS Affidavit and Warrant

Before signing the GPS Warrant, Judge Prine was required to make a "practical, common-sense decision" about whether the "totality of the circumstances" indicated that there was probable cause that the sought-for evidence would be obtained. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Martin*, 297 F.3d 1308, 1317 (11th Cir. 2002) (stating that a magistrate judge makes his own independent assessment as to whether the warrant and its underlying affidavit contain a sufficient amount of information to support a finding of probable cause). The Supreme Court "has emphasized that courts should pay great deference to a magistrate judge's determination of probable cause." *McLane Co. v. E.E.O.C.*, 581 U.S. 72,

---

[11] The installation of a GPS device on a person's vehicle, and the use of that device to monitor the vehicle's movements, constitutes a "search." *United States v. Jones*, 565 U.S. 400, 404 (2012).

84 (2017), *as revised* (Apr. 3, 2017) (citation and internal quotation marks omitted). "And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238–39 (1983) (alterations adopted) (internal quotation marks omitted). According to Eleventh Circuit precedent, "the practical nature of the magistrate's decision justifies 'great deference' upon review and calls for upholding the magistrate's findings even in marginal or doubtful cases." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).

### 1. Probable Cause Supported by Controlled Buys

An affidavit supporting the request for authorization to install a GPS tracker must be supported by the same probable cause necessary for a search warrant. *Cf. Nixon*, 918 F.2d at 900 (applying the same probable cause analysis required for a search warrant to an application for a wiretap).

> Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity. The information in the affidavit must also be fresh. If an informant is mentioned in the affidavit, the affidavit must also demonstrate the informant's veracity and basis of knowledge. However, when there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.

*Martin*, 297 F.3d at 1314 (alterations adopted) (citations and internal quotation marks omitted).

Reported case law in the Eleventh Circuit setting out specific requirements for a valid controlled buy is scarce. However, this Court recently gathered, from persuasive unreported Eleventh Circuit cases, a list of factors a court may consider in assessing a motion to suppress based, at least in part, on allegations that the affidavit was insufficient to establish probable cause because the controlled buy(s) was invalid or the affidavit omitted material information regarding the controlled buy. Those cases show that the following nonexhaustive list of factors may be relevant:

> (1) the confidential informant ("CI") and its vehicle, if applicable, are searched prior to the buy to establish that the CI does not have drugs in its possession; (2) the CI is provided with government funds that are usually marked in some manner; (3) officers travel with or follow the CI to the buy location; (4) officers maintain knowledge of CI's location and, if possible, some degree of visual or audio contact with CI during the controlled buy; (5) officers observe CI leave the buy location; and (6) officers follow CI to a prearranged meeting place

where CI is searched again for drugs obtained and any remaining government funds.

*United States v. Murray*, No. 7:23-cr-24, 2025 WL 1250024, at *7 n.8 (M.D. Ga. April 30, 2025) (citing *United States v. Floyd*, No. 22-12693, 2023 WL 5603213 (11th Cir. Aug. 30, 2023) (per curiam); *United States v. Roundtree*, 299 F. App'x 905 (11th Cir. 2008) (per curiam); *United States v. Bramlett*, 232 F. App'x 940 (11th Cir. 2007) (per curiam); *United States v. Horne*, 198 F. App'x 365 (11th Cir. 2006) (per curiam); and *United States v. Harris*, 172 F. App'x 950 (11th Cir. 2006) (per curiam)). While a controlled buy exhibiting all of these factors may be the perfectly executed example, the case law does not support a rule that all such factors must be present for a controlled buy to support a finding that a warrant affidavit is sufficient to establish probable cause. It is important to remember that analyzing a controlled buy is but one part of determining whether a probable cause affidavit contains sufficient information to conclude, *based on the totality of the circumstances*, that a fair probability exists that seizable evidence would be found in the place sought to be searched. *Brundidge*, 170 F.3d at 1352.

      *2. The GPS Affidavit was sufficient*

      Clemson Graham contends that none of the six controlled buys offered to support a finding of probable cause to issue the GPS Warrant were conducted with the appropriate safeguards as to the veracity of CS-1. Specifically, he contends no information is provided regarding CS-1's basis of knowledge, how Agt. Stanaland knew CS-1, whether CS-1 had previously provided information to law enforcement and, if so, whether such information was accurate and reliable. Nor was there information regarding CS-1's motive for assisting law enforcement or whether CS-1 had an incentive to lie regarding its assertions against Clemson Graham. Defendant also contends the controlled buys were not properly conducted because Agt. Stanaland did not personally observe the exchange of money and drugs "with his own eyes." (Doc. 55 at 9; Doc. 66 at 12–13). Finally, Defendant contends that the eight incidents where officers personally observed activities at 209 Ruth Lane which they believed were customers purchasing drugs from Clemson Graham are irrelevant and speculative. Defendant bases his position on the fact that none of those individuals were stopped so the officers did not confirm that actual drug transactions took place. Finally, Clemson Graham argues that the idea that he was storing drugs elsewhere was speculative. Therefore, according to Defendant, the GPS Warrant should never has been issued.

Instead of looking at the totality of the circumstances as the Court is required to do, Defendant focuses first on the controlled buys separate from all the other information in the GPS Affidavit. Concluding that the controlled buys are insufficient, Defendant next focuses on the transactions Agt. Stanaland personally observed between Defendant and his customers and finds them insufficient corroboration. Finally, Defendant separately considers Agt. Stanaland's observations that Clemson Graham was away from 209 Ruth Lane two to three nights a week and concludes that is insufficient to believe that Clemson Graham had drugs stored elsewhere and thus there was no probable cause to issue the GPS Warrant. That is not how a totality of the circumstances analysis is applied.

Defendant's arguments are: First, the controlled buys were deficient because none of the law enforcement officer personally observe the actual exchange of drugs for money between CS-1 and Clemson Graham, neither CS-1 nor its vehicle were searched prior to the controlled buys, and there is no information as to CS-1's reliability or basis of knowledge. Second, Agt. Stanaland's personal observations of suspected drug transactions is insufficient corroborations of CS-1's information. Third, there is insufficient information to establish probable cause that Clemson Graham was storing drugs at another location so as to justify allowing the GPS tracker to be placed on the Tahoe.

This Court notes that Eleventh Circuit case law does not support an argument that a law enforcement officer must have personally observed an actual controlled-buy transaction. *See Murray*, 2025 WL 1250024, at *7–8. Defendant does not provide any authority holding otherwise. Clemson Graham's contention here that Agt. Stanaland or another law enforcement officer must have personally observed "with his own eyes" the transactions between Clemson Graham and CS-1 before any of the controlled buys was valid is unpersuasive. As to the February 8, 2021 controlled buy, the GPS Affidavit states that the phone call between Clemson Graham and CS-1 setting the meeting place was actively monitored by agents and that Agt. Stanaland and other agents surveilled the meeting location, 209 Ruth Lane, before and during the controlled buy. (GPS Aff. 3). With respect to observing the other five controlled buys, Agt. Stanaland and other narcotics agents conducted "mobile as well as static surveillance on the source's vehicle traveling to the area of Ruth Lane." (*Id.* at 3–4).

Defendant's argument that CS-1 and its vehicle were not searched is subsumed in his argument that Agt. Stanaland failed to provide information as to CS-1's basis of knowledge and veracity. However, the lack of such information is not fatal to a finding of probable cause under a totality of the circumstances analysis. *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) ("Discounting the affidavit's allegation of the CI's veracity, however, does not end the analysis."). A deficiency as to a CI's basis of knowledge or veracity may be compensated for by a strong showing by some other indicia of reliability, "such as corroborating evidence gathered by law enforcement." *Id.* (stating officer's surveillance may constitute sufficient corroboration of the CI's veracity to support overall finding of probable cause). "When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *Martin*, 297 F.3d at 1314. Here, the surveillance and active role of the officers support the inference that the drugs were obtained as CS-1 represented.

The GPS Affidavit contained substantial information corroborating CS-1's information. In *United States v. Pruitt*, a CI informed a law enforcement officer with the Montgomery Police Department ("MPD") that drugs were being sold at a specific address. This was the officer's first time to use this particular CI, who described the drug seller as a black male named "Steve" who was "in his 30s, dark complexion, approximately 6'0", approximately 230 pounds and low haircut style." No. 2:18-CR-106, 2019 WL 2202775, at *1 (M.D. Ala. May 21, 2019), *report and recommendation adopted*, No. 2:18-CR-106, 2019 WL 2453607 (M.D. Ala. June 11, 2019). The officer used the CI to conduct one controlled buy of marijuana from "Steve" and then used the CI's information to prepare a search warrant and affidavit to search the address provided by the CI.[12] *Id.* Although one other officer in the MPD had

---

[12] The information as to the controlled buys here is very similar to the information in the *Pruitt* affidavit, which stated:

> During the month of July 2017, "A" under the direct control and supervision of Detective E.L. Dailey #2464 and Sergeant J.S. Dunn went to 2461 Brooks Court, Montgomery, AL to attempt to make a controlled purchase. "A" advised he/she made contact with "Steve" inside the residence. "A" advised he/she asked "Steve" for pound of mid (meaning marijuana). "A" advised that "Steve" retrieved a quantity of marijuana from a bag. "A" advised that "Steve" handed him/her a quantity of marijuana. "A" then gave "Steve" a quantity of the Montgomery Police Department Drug Buy Money. This controlled drug buy occurred within 72 hours of the issuance of this warrant.

*Pruitt*, 2019 WL 2202775, at *2 (alterations adopted) (emphasis omitted). Similar to the GPS Affidavit, the *Pruitt* affidavit did not state that the CI was searched. However, at the hearing on the motion to suppress, the *Pruitt*

previously used the CI, that information was not included in the officer's affidavit. *Id.* A warrant was issued, executed, and drugs were seized from the location. *Id.* at 2. Pruitt was indicted on drug related charges and filed a motion to suppress asserting the warrant affidavit did not establish the CI's reliability and veracity and thus the warrant was issued without probable cause.[13] *Id.* at 3. The *Pruitt* court disagreed finding that the search warrant passed constitutional muster. *Id.* In doing so, the court noted the requirement for it to consider the totality of the circumstances in assessing probable cause, that the Eleventh Circuit has rejected a *per se* rule mandating independent police corroboration of confidential information, and that the courts have recognized more than one way to corroborate information. *Id.* (citing *Gates*, 462 U.S. at 232; *Brundridge*, 170 F.3d at 1352; *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995)).

The Government asserts that Agt. Stanaland's personal observation of Clemson Graham personally engaging in eight[14] suspected drug transactions at 209 Ruth Lane during the July 10 to July 24, 2021 surveillance period corroborate CS-1's information. According to Defendant, because none of Clemson Graham's alleged customers were stopped and searched, and no suspected drugs were tested, Agt. Stanaland's observations are essentially worthless and do not corroborate CS-1's information. The Court disagrees.

Here, Agt. Stanaland outlined his experience and training related to his various duties, and particularly searches and seizures and the use of confidential informants. Specifically, he has "participated in the planning and execution of numerous high-risk search warrants gathered from narcotics and criminal gang investigations." (GPS Aff. 2). He is familiar with the practices of drug traffickers, how the drugs are packaged, language and terms that are used to disguise the source and nature of their illegal drug dealings, and the methods used to thwart detection, arrest, and law enforcement's ability to obtain lawful proof of evidence of their

---

officer recalled telling the judge that the CI was searched before the controlled buy, that she and another officer listened to the CI's conversation with "Steve" using a radio transmitter and concealed microphone, and that the CI was searched after he left the residence and a pound of marijuana was retrieved from him. *Id.*

[13] At the hearing on the motion to suppress, the officer testified that the municipal court judge required more information about the controlled buy before signing the warrant. The officer could not recall whether the judge asked about the CI's reliability. Nor did the officer have any specific memory of what she told the judge about the CI's reliability. *Pruitt*, 2019 WL 2202775, at *2.

[14] Although Agt. Stanaland observed nine transactions, one of those involved a seller other than Clemson Graham.

wrongful activities. (*Id.*) Defendant offers no supporting authority for his position that a trained narcotics officer's personal observations of multiple incidents of activity known to be consistent with drug trafficking practices, is insufficient to corroborate the information obtained from CS-1 to the effect that he purchased drugs from Clemson Graham. The Court finds that Agt. Stanaland's personal observation of Clemson Graham personally engaging in eight suspected drug transactions at 209 Ruth Lane during the July 10 to July 24, 2021 surveillance period, corroborate CS-1's assertions that he purchased drugs from Clemson Graham during each of the described controlled buys. *Cf. United States v. Walker*, 390 F. App'x 854, 856 (11th Cir. 2010) (considering law enforcement officers' personal observations of suspected drug activity at residence in its probable cause analysis for exigent circumstances, warrantless entry into home).

In addition, CS-1 was familiar with Clemson Graham, knew he was also known as "Pootsie," that he lived at 209 Ruth Lane, and that 217 Ruth Lane was the residence of Clemson Graham's parents. (GPS Aff. 2). Finally, there was not just one controlled buy as occurred in *Pruitt*—there were six buys using CS-1 and each buy resulted in CS-1 bringing back methamphetamine to Agt. Stanaland.

Defendant's final argument is that any contention that he was storing drugs at an unknown location is speculative. Considering the totality of the circumstances, the Court disagrees. CS-1 advised Agt. Stanaland that Clemson Graham had a possible source of drug supplies at an unknown location in Georgia, and that Clemson Graham occasionally stays at an unknown location in Boston, Georgia, with an unknown girlfriend. (*See* GPS Aff. at 2, 5). Through electronic surveillance of 209 Ruth Lane, Agt. Stanaland observed that Clemson Graham stayed at 209 Ruth Lane four to five days per week and that he was gone from the residence in the Tahoe two to three nights per week. Agt. Stanaland requested the GPS tracker because continuous visual surveillance of the Tahoe was not practicable for several reasons, including "the difficulties and limitations inherent in the physical surveillance of a vehicle and the resulting risks to individual officers and of compromising the investigation." (*Id.* at 5).

Defendant bears the initial burden to establish that the GPS Warrant is defective. *Lockett*, 533 F. App'x at 965 (11th Cir. 2013) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."). In reviewing

the GPS Affidavit, the Court finds that Judge Prine had a substantial basis for concluding that probable cause existed to issue the GPS Warrant.[15] *Gates*, 462 U.S. at 238–39.

Accordingly, Defendant's Motion to Suppress is **DENIED** with respect to evidence obtained via the GPS Warrant.

### B. Traffic Stop and Tahoe Search

Clemson Graham contends that Agt. Stanaland directed the Georgia State Patrol to conduct the traffic stop based on the probable cause on which he obtained the GPS Warrant, and because that information was insufficient to support the GPS Warrant, it was also insufficient to support the traffic stop. This argument is foreclosed by the Court's finding that the GPS Affidavit did in fact provide Judge Prine with a substantial basis for concluding that probable cause existed to issue the GPS Warrant, and by the Supreme Court precedent stating that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). In *Riley v. City of Montgomery*, 104 F.3d 1247 (11th Cir. 1997), the Eleventh Circuit recognized the change *Whren* required in the Circuit's historical practice of considering whether an "illegitimate motivation" was present in reviewing the validity of a traffic stop, stating:

> [T]he Supreme Court rejected our former approach and held that the constitutional "reasonableness" of a traffic stop is determined irrespective of "intent," either of the individual officer involved, or any theoretical "reasonable officer" (or, as the Court termed it, "virtual subjectivity"). The only question is whether the suspect's behavior gave rise to probable cause sufficient to justify the seizure.

*Id.* at 1252 (internal citations omitted). The Court finds that Tpr. Kornegay's testimony at the Suppression Hearing was credible and clearly shows that Tpr. Kornegay had probable cause to stop Clemson Graham because the Tahoe was travelling over the speed limit.

Having determined that the stop was valid, the next question is whether there was probable cause to search the Tahoe. "The automobile exception permits warrantless vehicle searches if the vehicle is operational and agents have probable cause to believe the vehicle contains evidence of a crime." *United States v. Dixon*, 901 F.3d 1322, 1339 (11th Cir. 2018)

---

[15] Because the Court finds that probable cause existed to support the GPS Warrant, the Court need not, and does not, address the Government's alternative reliance on the "good faith" exception to such warrant. *See United States v. Leon*, 468 U.S. 897 (1984).

(alteration adopted) (internal quotation marks omitted). Once Clemson Graham was stopped, Tpr. Kornegay testified that he smelled marijuana and observed Clemson Graham chewing raw marijuana which he believed provided him with probable cause to search the Tahoe. Defendant counters that the dashcam video from his patrol car shows that Tpr. Kornegay did not smell the marijuana, nor tell Defendant to open his mouth, until after Defendant had been placed in handcuffs. Therefore, Defendant argues, he had been arrested, but had not been informed of his constitutional rights to refuse Tpr. Kornegay's order for him to open his mouth at the time the Tahoe was searched. Defendant also appears to argue that Tpr. Kornegay conducted an invalid search of his person which is a new argument relating to the traffic stop.

The dashcam video was viewed during the Suppression Hearing. Afterward, Tpr. Kornegay confirmed that he did not ask Defendant to open his mouth so he could confirm that Defendant was chewing or eating marijuana until after Defendant was in handcuffs. (Suppression Hr'g Tr. 28:24–29:3). However, the video also clearly reflects that Tpr. Kornegay smelled marijuana prior to putting the handcuffs on Clemson Graham. (*See* Video 1:32–1:36 (showing Tpr. Kornegay telling Defendant to sit on the bumper of Defendant's car and while seated, Tpr. Kornegay told Defendant he was speeding and that "you smell like weed.")). The smell of marijuana, alone, established probable cause for the search of the Tahoe. *See Dixon*, 901 F.3d at 1339 ("We have explained that an officer's credible testimony that he smelled marijuana can establish probable cause."); *United States v. Williams*, 731 F. App'x 863, 867 (11th Cir. 2018) ("In a long line of cases, we have held that the smell of marijuana coming from a person's house or vehicle establishes probable cause for a search." (citing cases)).

Finally, the Video reflects that by the time Tpr. Kornegay ordered Clemson Graham to open his mouth, no marijuana was visible. (*See* Video 2:20–2:28 (showing that when Defendant opens mouth Tpr. Kornegay states "yeah, you ate it.")). Thus, there is no evidence of marijuana being seen in Defendant's mouth *after* he had been placed in handcuffs.

Based on the foregoing and the Court having found that Tpr. Kornegay had probable cause to stop the Tahoe, with respect to the search of the Tahoe, the Court finds that (1) the automobile exception applies because there is no doubt that the Tahoe was operational as Clemson Graham was driving the vehicle; and (2) Tpr. Kornegay smelled marijuana on

Clemson Graham upon his exiting the Tahoe and prior to Tpr. Kornegay placing him in handcuffs. Therefore, as shown by the totality of the circumstances, there was probable cause to search the Tahoe.

Accordingly, Defendant's Motion to Suppress is **DENIED** with respect to evidence obtained via the Traffic Stop and Tahoe Search.

### C. Ruth Lane Warrant

Clemson Graham contends that the same six controlled buys as described in the GPS Affidavit were used to support the Ruth Lane Warrant. He contends that "the affidavit describes the same six undercover drug buys which were included in the affidavit for the tracker warrant but describes them very differently." (Doc. 55 at 15). Defendant specifically points out that the description of the controlled buys now state that the source was searched prior to leaving to make the drug purchases and that Agt. Stanaland personally observed the source at the location where the transactions took place. In addition, Defendant notes that the Ruth Lane Warrant does not mention the fourteen days 209 Ruth Lane was under surveillance and the transactions Agt. Stanaland observed at that time. Defendant does not argue that the controlled buys in the Ruth Lane Warrant were insufficient to provide probable cause or that they were not correctly conducted. Rather, he infers there is something nefarious in the differences in the manner the controlled buys are described in the Ruth Lane Affidavit as opposed to the GPS Affidavit.[16] Defendant contends:

> These differences, both the inclusions and the exclusions, serve to arguably make the application to search 209 Ruth Lane a much stronger application, because they cured the problems so evident in the affidavit supporting the tracker warrant. However, the fact of the inclusions and exclusions certainly raises questions about the reasons for them. Those questions could only be answered by Agent Stanaland via live, sworn testimony.

Doc. 66 at 23. The Government states that the Ruth Lane Warrant was obtained through a wholly independent source, and that nothing in the Ruth Lane Affidavit came from information obtained via the GPS Warrant. The Court notes that the dates of the controlled buys in the GPS Affidavit and those in the Ruth Lane Affidavit do not support the assertion that the same controlled buys were used to support both warrants. There were not six buys

---

[16] Defendant also contends that the Ruth Lane Warrant is tainted by the invalid GPS Warrant. This argument is again foreclosed by the Court's finding that the GPS Warrant was valid.

described in the Ruth Lane Affidavit, but four, the first of which was conducted within thirty days of September 7, 2021, the date the Ruth Lane Affidavit was submitted. Thus, the first buy could not have occurred any earlier than August 8, 2021, and the other three controlled buys described in the Ruth Lane Affidavit all occurred later than August 8, 2021. (Ruth Lane Aff. 2). The latest controlled buy in the GPS Affidavit occurred on June 23, 2021—well before the first controlled buy in the Ruth Lane Affidavit. (GPS Aff. 4). Clemson Graham's inference that Agt. Stanaland changed his description of the same controlled buys to cure problems with the GPS Affidavit fails for want of sufficient facts to create such inference. Not only is there nothing to support the contention that the same controlled buys were used to support both warrants, there is nothing to support any argument that the same source was used.

In reviewing the Ruth Lane Affidavit, the Court finds that Judge Prine had a substantial basis for concluding that probable cause existed to issue the Ruth Lane Warrant.[17] *Gates*, 462 U.S. at 238–39.

Accordingly, Defendant's Motion to Suppress is **DENIED** with respect to evidence obtained via the Ruth Lane Warrant.

## V.  CONCLUSION

Based on the totality of the circumstances, the Court finds that the Consolidated Motion to Suppress Evidence and Request for Evidentiary Hearing (Doc. 55) is **DENIED**.[18]

By Order (Doc. 75) entered September 30, 2025, the trial of this matter has been continued the Court's Valdosta February 2026 trial term beginning February 2, 2026. At the appropriate time, a Notice of Pretrial Conference and Trial will be issued.

**SO ORDERED**, this 26th day of November 2025.

/s/W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**

---

[17] As with the GPS Warrant, because the Court finds that probable cause existed to support the Ruth Lane Warrant, the Court need not, and does not, address the Government's alternative reliance on the "good faith" exception to such warrant. *See Leon*, 468 U.S. 897.

[18] Notwithstanding denial of Defendant's Motion as titled, the Court held an evidentiary hearing as requested.